IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TANYA R. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-10-165-F |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her applications for disability insurance and supplemental

security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C.

§§ 416(I), 1382. Defendant has answered the Complaint and filed the administrative record

(hereinafter TR___), and the parties have briefed the issues. The matter has been referred

to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C.

§636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's

decision be reversed and remanded for further administrative proceedings.

I. Background

Plaintiff filed an application for benefits on August 15, 2003, and this application was

denied initially on December 2, 2003. (TR 21). Plaintiff did not seek administrative review

1

of this decision. On January 31, 2005, Plaintiff filed new applications[1] for disability insurance and supplemental security income benefits. (TR 21). Plaintiff alleged that she was disabled due to bipolar disorder accompanied by severe depression and anxiety. (TR 56, 131). Plaintiff also alleged low back pain. (TR 124). The record shows Plaintiff had a GED education and had been sporadically employed. (TR 60-61, 99-107). In a written interview completed in March 2005, Plaintiff stated that she was the primary caretaker for her husband and three small children. She described daily activities of getting her children ready for school each morning, taking them to school and picking them up after school, paying bills, cooking meals, performing laundry and cleaning chores, driving a car, and shopping for clothing and food. (TR 114-121). The applications were denied, and a hearing *de novo* was conducted before Administrative Law Judge Bennett ("ALJ").[2] The ALJ issued a decision on March 23, 2007, in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 21-28). The Appeals Council reversed this decision based, in part, on the ALJ's failure to update Plaintiff's treatment records prior to the decision. (TR 15-17).

A second administrative hearing *de novo* was conducted before the ALJ on February 4, 2009. (TR 432-480). At this hearing, Plaintiff appeared with counsel and testified. A medical expert ("ME") and a vocational expert ("VE") also testified. Following the hearing,

---

[1] These applications do not appear in the administrative record.

[2] The transcript of this hearing does not appear in the administrative record.

the ALJ issued a decision on August 13, 2009, in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 34-46). The Appeals Council declined to review this decision (TR 8-10). Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

II. Standard of Review

Judicial review of this action is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). However, the court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the record fairly detracts from its weight." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(I), 1382c(a)(3)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. <u>See</u> 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f) (2010); <u>see</u> <u>also</u> <u>Grogan v. Barnhart</u>, 399 F.3d 1257, 1261 (10th Cir. 2005)(describing five steps in detail). The plaintiff bears the burden of showing that he or she has one or more severe impairments that prevent the plaintiff from performing previous work activity. When this *prima facie* showing is made, "the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given [the claimant's] age, education, and work experience." <u>Grogan</u>, 399 F.3d at 1261; <u>accord</u>, <u>Channel v. Heckler</u>, 747 F.2d 577, 579 (10th Cir. 1984).

III. <u>Hearing Testimony</u>

Plaintiff testified at her second administrative hearing that she was 42 years old and that she had previously worked in 2003 for approximately six weeks on an industrial clean-up crew until this job ended. (TR 442-443). In July 2004, Plaintiff testified she began part-time work as a stage hand for a concert venue and later worked for a month as a newspaper carrier. (TR 443). Plaintiff stated that her work history was sporadic because she had difficulty getting along with other people, felt mistreated, and was usually terminated. (TR 444-445). Plaintiff testified she was disabled due to bipolar disorder, and she described

symptoms related to this impairment, including frequent changes in her moods, "wak[ing] up just mad at the world" at least 3 days a week, a previous hospitalization for a suicidal attempt, and rage-filled black-out spells. (TR 445-447). Plaintiff testified that her usual daily activities involved home maintenance chores, occasional grocery shopping, and caring for herself and her three minor children. (TR 459-460).

Based on Plaintiff's testimony and statements in the record, the VE testified that Plaintiff had previously worked as a stage technician, auto mechanic, parts puller, and bartender and that these jobs were light to heavy, semi-skilled or skilled jobs. (TR 471-474). In response to hypothetical questioning by the ALJ of job availability for a person with Plaintiff's work history and the ability to perform sedentary work with a sit/stand option, the VE testified that the hypothetical individual could perform the unskilled, sedentary jobs of addresser, machine tender operator, and assembler. (TR 474-476).

The ME testified that Plaintiff's physical impairment due to low back pain and mental impairment due to bipolar disorder or major depression disorder were not severe enough to satisfy the requirements of the regulatory listings for these impairments. (TR 436). The ME further testified that an individual with Plaintiff's medical record could perform work that did not require sitting for more than one hour at a time or six hours in an eight hour day, did not require walking for more than one hour at a time or about four hours in an eight hour day, did not require more than occasional bending, crouching, stooping, climbing, twisting, or more than lifting 20 pounds on an occasional basis or 10 pounds on a frequent basis, and was performed in a "nonpublic" situation. (TR 437). The ME did not identify medical evidence

which supported this opinion but testified that he based the opinion on his review of Plaintiff's medical record.

IV. ALJ's Decision

The ALJ found in his decision that Plaintiff's insured status for the purpose of Title II benefits ended June 30, 2009. Therefore, the ALJ concluded Plaintiff must establish disability on or before that date in order to receive Title II disability insurance benefits. (TR 34). Following the required sequential analysis, the ALJ found at step one that Plaintiff had not worked since September 10, 1999, her alleged onset date. At step two, the ALJ found that Plaintiff had severe impairments due to bipolar disorder, major depressive disorder, post-traumatic stress disorder, polysubstance dependence, mood disorder not otherwise specified, personality disorder not otherwise specified with borderline and paranoid features, intermittent explosive disorder, relational problem not otherwise specified, "rule out malingering," cervical spinal strain, lumbar spinal strain, and left shoulder sprain. (TR 40). At step three, the ALJ found that Plaintiff's impairments, considered singly or in combination, did not satisfy or equal one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1. (TR 41).

At the fourth step, the ALJ first considered the credibility of Plaintiff's allegations of "alleged pain and symptom-related limitations . . . ." (TR 41). With respect to Plaintiff's severe physical impairments, the ALJ found that Plaintiff's testimony was not consistent with the medical evidence, which showed she had "very mild" degenerative disc disease of her lumbar spine and "some minor injuries" resulting in cervical, lumbar, and left shoulder

strains. The ALJ found Plaintiff had "not sought or required extensive ongoing conservative medical treatments" for these conditions, and in multiple medical evaluations she exhibited no deficits in strength, joint flexibility, motor functions, reflexes, sensation, neurological functioning, or other physiological functions. (TR 42).

With respect to the severity of Plaintiff's mental impairments, the ALJ found that Plaintiff's allegation of disabling mental impairments was not credible because she had "persistently failed to maintain and comply with her prescribed medication therapies" and she had not "experienced frequent or prolonged acute episodes requiring inpatient or crisis treatments." The ALJ further reasoned that in multiple mental status evaluations Plaintiff had exhibited "intact mental orientation, thought processes, cognitive and average intellectual functions, memory, and attention and concentration." (TR 43). The ALJ further found that Plaintiff's failure to comply with medication therapy "appears to be [a] considered and contemplated choice and is not a by-product of her ongoing psychiatric symptomology [sic]." (TR 43). The ALJ also pointed to the report of Dr. Swink, a consultative psychological examiner, who noted that a portion of the psychological testing of Plaintiff conducted in April 2009 was considered invalid due to indications Plaintiff had exaggerated her psychiatric symptoms. (TR 43). The ALJ further reasoned that during this consultative evaluation Plaintiff described symptoms of nightmares and flashbacks of previous traumatic events that she had not previously mentioned. Finally, the ALJ stated that Plaintiff's "report of her history of substance abuse and her history of being a victim of abuse has not been consistent." (TR 44).

Concerning the severity of Plaintiff's mental impairments, the ALJ addressed functional limitations resulting from those impairments, as required by the applicable regulations, and found that Plaintiff's mental impairments had resulted in "mild" restrictions in daily living activities, "moderate" difficulties in maintaining social functioning, "mildly moderate to moderate" difficulties in maintaining concentration, persistence, or pace, and "no" repeated or extended episodes of decompensation or deterioration in work or work-like settings. (TR 43).

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level except for work involving "more than occasional postural changes (including binding [sic], crouching, stooping, climbing, twisting, or turning) and/or more than superficial interactions with the general public." (TR 41). Because this RFC finding precluded Plaintiff's performance of her previous jobs (TR 44), the ALJ reached step five of the requisite sequential evaluation procedure.

Relying on the VE's testimony at the hearing, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because she could perform jobs available in the economy despite her impairments, including the jobs of addresser, machine tender, and assembler. (TR 45). The ALJ noted the VE's testimony that these jobs could be performed by an individual requiring a sit or stand option and that these jobs required little, if any, interaction with the general public. (TR 45).

V. <u>Steps Four and Five - Medical Opinions, RFC Finding, and Reliance on VE Testimony</u>

The medical record contains the opinions of various treating, examining, and non-

examining mental health professionals concerning Plaintiff's ability to perform mental work-related activities. Plaintiff contends that the ALJ erred in assessing the opinions of several of these mental health professionals, including Dr. Chakraburtty, a consultative psychiatric examiner, Dr. Swink, Dr. Poyner, another consultative psychological examiner, Mr. Britt, a mental health case manager/counselor, Dr. Goodrich, a consultative non-examining psychologist, and Dr. Lynn, the ME.

The Commissioner must "evaluate every medical opinion in the record, and unless [the Commissioner] gives a treating source's opinion controlling weight, [the Commissioner] will consider several factors in deciding the weight that should be given to any medical opinion." Salazar v. Barnhart, 468 F.3d 615, 625-626 (10th Cir. 2006)(citing 20 C.F.R. §416.927(d)). In evaluating medical opinions, the Commissioner must accord each opinion "the proper weight on the basis of: (1) the examining relationship; (2) the treatment relationship; (3) the length of the treatment relationship and the frequency of examinations; (4) the nature and extent of the treatment relationship; (5) how well the opinion is supported; (6) its consistency with other evidence; and (7) whether the opinion is from a specialist." Id. at 626. See also Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); 20 C.F.R. §§404.1527(d), 416.927(d). The ALJ "must give good reasons ... for the weight assigned" to a medical opinion and set forth specific, legitimate reasons for completely rejecting an opinion of an acceptable treating source. Watkins, 350 F.3d at 1300-1301.

Additionally, an ALJ must consider the findings of state agency medical and psychological consultants as opinion evidence. 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).

Should the ALJ decide in his or her discretion to obtain the report of a consultative examiner and/or the testimony of a medical expert, the ALJ must evaluate these opinions using the same rules used to evaluate treating physician opinions. 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).

A mental health counselor is not an "acceptable medical source" under the agency's regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a). However, a counselor is considered an "other source" who can provide evidence to show the severity of a claimant's impairment and how it affects the claimant's ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d). The opinions of "other sources" are evaluated using the factors set forth in 20 C.F.R. §§404.1527(d) and 416.927(d). Social Security Ruling 06-03p, 2006 WL 2329939 (Aug. 9, 2006). These factors include (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support the opinion; (4) how well the source explains the opinion; (5) where the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. Knight v. Astrue, 388 Fed.Appx. 768, 2010 WL 2853668, * 4 (10th Cir. July 21, 2010)(unpublished op.).

The medical record reflects that Plaintiff was briefly hospitalized in August 2003. The hospital's treating physician, Dr. Rahhal, reported that Plaintiff had overdosed on an anti-anxiety medication and that she was diagnosed with recent major depressive episode with suicidal thoughts and a history of bipolar disorder. (TR 223). A mood stabilizer

medication was prescribed for her bipolar disorder, her condition stabilized, and she was discharged the following day. (TR 223-224, 228). In a mental status evaluation conducted by Dr. Narula, a psychiatrist, during this hospitalization, Dr. Narula reported that Plaintiff exhibited hyperverbal and circumstantial speech, fair concentration, and restless psychomotor activity. (TR 229). Plaintiff admitted she was depressed, anxious, and felt very agitated at times. (TR 229). Plaintiff also admitted she had physically abused her husband and he had threatened to leave her. (TR 231). Plaintiff was advised to seek therapeutic treatment at a community mental health center. (TR 224).

A consultative physical examination of Plaintiff was conducted in October 2003 by Dr. Saidi. Dr. Saidi reported that the examination was essentially normal except for decreased vision without eyeglasses. (TR 259-264). Dr. Saidi reported Plaintiff was ten weeks pregnant, had a history of bipolar disorder, she had been married for one year, and she had two children, a nine year old and a two year old. (TR 259-264).

In December 2003, Plaintiff sought mental health treatment from Dr. Linden. (TR 285-286). Dr. Linden noted Plaintiff sought mood stabilizing medication for her bipolar disorder, and she described symptoms of mood swings, anger, irritability, lack of energy and motivation, and a desire not to leave her home. Plaintiff further stated she had been prescribed a mood stabilizing medication two to three months earlier but had discontinued the medication when she became pregnant. In a mental status evaluation, Dr. Linden noted that Plaintiff exhibited an anxious affect, a dysphoric mood, intact attention and concentration, and limited insight and judgment. Dr. Linden diagnosed Plaintiff with bipolar

disorder I, most recent episode depressed. Dr. Linden prescribed anti-depressant medication for Plaintiff and noted that mood stabilizing medication was not prescribed due to Plaintiff's pregnancy. (TR 285-286). There is no record of further treatment of Plaintiff by Dr. Linden.

Dr. Poyner, a consultative psychologist, evaluated Plaintiff for the agency on July 1, 2005. In Dr. Poyner's report of his evaluation of Plaintiff, Dr. Poyner noted that Plaintiff exhibited a mixed and labile affect and moderately expansive motor movements. (TR 308). She described constant crying, "horrible" anger, and severe depression. (TR 308). In a mental status evaluation, Dr. Poyner noted Plaintiff exhibited average intellect, pressured, tangential, and circumstantial speech, poor judgment, no communication deficits, and intact thought processes. Dr. Poyner also noted Plaintiff appeared hypomanic[3] during the evaluation.

Plaintiff admitted she was not taking the medication prescribed for her bipolar disorder. Plaintiff reported she had been emotionally abused as a child when her "dad held guns to my head," and she had a history of multiple suicidal attempts and one brief hospitalization two years before in a mental health unit. She reported she had no suicidal thoughts but she had homicidal plans involving a woman who had caused "problems" in her marriage. (TR 309). She described a "rocky" marriage and three children, part-time employment as a concert stage worker, and an inability to maintain employment. (TR 309-

---

[3]Individuals with bipolar disorder may experience hypomania in which the person may have increased energy and activity levels that are not as severe as typical mania. http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml. "Without proper treatment, however, people with hypomania may develop severe mania or depression." Id.

310). Dr. Poyner noted Plaintiff appeared somewhat unstable but exhibited some insight into her present functioning by wishing she could "be ok mentally" and acknowledging the impact of her behavior on her husband. The diagnostic assessment was bipolar disorder, most recent episode mixed, without psychotic features and possible personality disorder not otherwise specified. (TR 311). Dr. Poyner posited that with medication Plaintiff would improve but that her "current condition precludes her from working at this time." (TR 311).

Dr. Goodrich, a reviewing consultative psychologist, completed a mental RFC assessment for the agency. (TR 313-316). In this form dated July 12, 2005, Dr. Goodrich opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and moderately limited in her ability to interact appropriately with the general public. (TR 313-314). Dr. Goodrich specifically noted that Plaintiff could "interact appropriately with others at a superficial level." (TR 315). This assessment was affirmed by another consultative psychological reviewer, Dr. Smallwood, on October 28, 2005. (TR 315).

Dr. Goodrich also completed a Psychiatric Review Technique ("PRT") form dated July 12, 2005. (TR 317-329). In this form, Dr. Goodrich opined that Plaintiff's severe mental impairments due to bipolar disorder and personality disorder had resulted in functional limitations, including mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. (TR 317-327). To explain this assessment, Dr. Goodrich pointed to Plaintiff's statements concerning her usual daily

activities. (TR 329).

The record reflects that Plaintiff was sporadically treated at a mental health clinic, Hope Community Services, Inc. ("Hope") between April 2006 and July 2007. (TR 344-403). Mr. Britt was Plaintiff's counselor at Hope beginning in April 2006. (TR 133, 359, 388). Two written assessments authored by Mr. Britt appear in the record. In the first assessment dated December 20, 2008, Mr. Britt stated that, based on his review of Plaintiff's medical records from Dr. Linden, Midwest Regional Medical Center, Hope, and the Mary Mahoney Medical Clinic, Plaintiff was unable to sustain gainful employment beginning in August 2003, when her psychiatric symptoms became severe. (TR 133). Mr. Britt stated that Plaintiff was able to work eight hours per week as a stage hand only because "accommodations" were made "for her mental instability and inability to work with others . . . ." (TR 134). Mr. Britt further opined that Plaintiff would need to take numerous unscheduled breaks during an eight-hour working day and that her bipolar impairment would likely produce good days and bad days. (TR 135). In a PRT form dated December 20, 2008, Mr. Britt stated that Plaintiff's impairment due to bipolar disorder satisfied Listing 12.04. (TR 331-338). However, the form does not provide an explanation for this conclusion.

The ALJ obtained the report of a consultative psychological examiner, Dr. Chakraburtty, who evaluated Plaintiff for the agency in April 2009, two months after the second administrative hearing. In this report, Dr. Chakraburtty noted that Plaintiff provided a history of her mental health treatment and her symptoms. Plaintiff stated she was not taking psychotropic medication and had not been treated by a psychiatrist since November

2008. (TR 410).  Plaintiff described constant sadness or anger and an inability to get along with other people, which she believed caused her to be disabled and unable to work for the previous two years. (TR 410).  Plaintiff described additional symptoms of sleeping four to six hours per night, racing thoughts, nightmares of two previous sexual assaults, and frequent crying spells.  She stated her usual daily activities were performing household chores and caring for her children. (TR 410). Dr. Chakraburtty noted that Plaintiff's medical records had been reviewed, including the reports of Dr. Poyner, Dr. Saidi, Dr. Chaudry, Dr. Rahhal, and Hope. (TR 411).  In a mental status evaluation, Dr. Chakraburtty reported Plaintiff exhibited normal speech, good eye contact, normal thought processes and content, sad and periodically mad mood by history, blunt affect, poor insight, impulsive and dependent judgment, and intact concentration, short term memory, and abstract abilities. (TR 412).  The diagnostic assessment was chronic post-traumatic stress disorder, polysubstance dependence, history of bipolar disorder and major depression, and personality disorder not otherwise specified. (TR 412).  Dr. Chakraburtty completed a written Medical Source Statement of Plaintiff's ability to perform mental work-related activities in which the psychiatrist opined that Plaintiff had moderate restrictions in her ability to comprehend and carry out complex instructions, moderate restrictions in her ability to make judgments on complex work-related decisions, marked restrictions in her ability to interact with the public, with supervisors, and with co-workers, and moderate restrictions in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  (TR 414-416).

Dr. Swink, a clinical psychologist, conducted a psychological evaluation of Plaintiff

for the agency on March 26, 2009, approximately one month after the second administrative hearing. In this evaluation, Dr. Swink conducted multiple tests and a mental status evaluation. (TR 418-424). Dr. Swink also noted he had reviewed Plaintiff's medical records, including the records of Dr. Linden, Dr. Poyner, a community clinic, and a mental health crisis center. According to Dr. Swink's report, Plaintiff had been separated from the father of her 4-year-old child for two years and she had "beat him several times" and was "extremely aggressive" toward him. (TR 418). She reported that her three children, who were then 14, 7, and 4, each had different fathers, and that relationships with the oldest two children's fathers ended because the men were drug and alcohol abusers and/or were physical abusive toward her. Plaintiff reported her then-current boyfriend was not abusive and was good to the children, although she was constantly angry, which she described as "explosions," and this anger was directed toward her boyfriend. (TR 418-419). Plaintiff also described becoming "physically rageful" if another female threatened to fight her. (TR 419).

Plaintiff reported one previous suicide attempt in 2003 by ingesting an overdose of anti-anxiety medication and previous diagnoses of bipolar disorder and PTSD. (TR 419). Plaintiff stated she was not taking mood stabilizing medication because she had learned of negative side effects and for financial reasons. She expressed a desire for a therapist who would talk with her rather than merely prescribe medication. (TR 419). Plaintiff reported she had sought treatment at a community mental health clinic and at a mental health crisis center for anger, anxiety, and constant crying due to stress concerning her family responsibilities. She denied suicidal thoughts. (TR 419).

During this evaluation, Plaintiff described her usual activities, including cooking, cleaning, shopping, going to the movies, attending school meetings with her children, crocheting, feeding birds, flower gardening, going out to eat, visiting her female friend, driving her children to school, and other activities, such as going to the zoo or traveling to Arkansas to visit relatives. (TR 420). Plaintiff provided a history of her family relationships, which included a physically and mentally abusive father and mother, and her education, which included special education classes until she dropped out in the eleventh grade and frequent suspensions for fighting. (TR 421). Plaintiff also reported two previous sexual assaults during her childhood. (TR 421).

Dr. Swink noted that psychological testing of Plaintiff revealed no deficits in her mental status or memory. However, other testing reflected severe depression and anxiety. Dr. Swink noted that the results of the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") were not considered credible because the results indicated exaggeration of symptoms. (TR 423). Dr. Swink's diagnostic assessment was mood disorder not otherwise specified, personality disorder not otherwise specified with borderline and paranoid features, intermittent explosive disorder, and relational problem not otherwise specified. (TR 424). Dr. Swink noted the existence of possible malingering and that Plaintiff would benefit from further mental health treatment and medications. (TR 424).

In a written Medical Source Statement of Plaintiff's mental work-related abilities, Dr. Swink opined that Plaintiff exhibited moderate restrictions in her ability to make judgments on complex work-related decisions, moderate restrictions in her ability to interact

appropriately with supervisors and co-workers, and moderate restrictions in her ability to respond appropriately to usual work situations and to changes in a routine work setting, as well as mild restrictions in her ability to interact appropriately with the public. (TR 425-427).

Dr. Lynn, the ME, testified that a hypothetical individual with Plaintiff's medical record, could perform work that did not require sitting for more than one hour at a time or six hours in an eight hour day, did not require walking for more than one hour at a time or about four hours in an eight hour day, did not require more than occasional bending, crouching, stooping, climbing, twisting, or more than lifting 20 pounds on an occasional basis or 10 pounds on a frequent basis, and was performed in a "nonpublic" situation. (TR 137).

Plaintiff first contends the ALJ did not provide adequate reasons for rejecting Dr. Chakraburrty's functional assessment. Dr. Chakraburrty found that Plaintiff was "markedly" limited in her ability to interact with the public, supervisors, and co-workers. (TR 415). In his decision, the ALJ expressly considered and rejected this functional assessment on the ground that the assessment was inconsistent with other medical and non-medical evidence in the record. (TR 43). The ALJ pointed to Plaintiff's statements during the consultative psychological evaluation conducted by Dr. Swink in April 2009 concerning her usual daily activities and relationships. (TR 43). During this evaluation, Plaintiff described a wide range of activities, including several social activities, school activities, and outdoor activities with her children and friends, and also a recent trip to see out-of-state relatives. (TR 420). The ALJ pointed to other evidence in the record that Plaintiff "acted on [a] referral" made by Dr.

Poyner to a community mental health crisis center and that Plaintiff had "essentially compl[ied] with her prescribed psychiatric treatment therapies by continuing to pursue ongoing psychiatric treatments and evaluations and to mostly abstain from drug and alcohol abuse," although she had been noncompliant with prescribed medications. (TR 43). The ALJ also reasoned that Plaintiff had exhibited adequate insight and judgment by not harming her children and by avoiding criminal and anti-social behavior, including not acting on her stated desire to physically harm the woman she claimed was harming her family. (TR 43). The ALJ also pointed to other evidence in the record reflecting that Plaintiff had exaggerated her symptoms during psychological testing.

Nevertheless, even though the ALJ explained his reasons for rejecting Dr. Chakraburrty's assessment of "marked" social functional limitations, the ALJ's RFC assessment contained no limitations concerning Plaintiff's ability to interact with supervisors or co-workers or to respond to changes in a routine work setting. Dr. Swink, another consultative examiner, conducted an extensive psychological evaluation of Plaintiff in March 2009. In this RFC assessment, Dr. Swink opined that Plaintiff was moderately limited by her mood disorder in her ability to interact with supervisors and co-workers and to respond adequately to changes in routine work settings. (TR 426). Plaintiff contends that the ALJ did not adequately consider this RFC assessment provided by Dr. Swink as well. Dr. Goodrich, a reviewing consultative psychologist, found that Plaintiff's mental impairments had resulted in moderate limitations in social functioning, and Dr. Goodrich specifically noted that Plaintiff's ability to interact "with others" was limited to "a superficial level." (TR 315).

Only Dr. Lynn, the ME, found that, based on his review of the medical record, Plaintiff would be limited to work in a "nonpublic" situation. (TR 437). Dr. Lynn is not a mental health professional, however, and he did not explain the evidentiary basis for his RFC assessment.

In determining Plaintiff's functional restrictions resulting from her mental impairments, the ALJ found that Plaintiff had moderate functional restrictions in social functioning and mildly moderate to moderate difficulties in maintaining concentration, persistence or pace. (TR 43). At step four, the ALJ found that Plaintiff had the RFC to perform light work with certain postural limitations and work that does not require more than superficial interaction with the general public. (TR 41). The ALJ's hypothetical inquiry to the VE addressed only physical limitations. (TR 474). The VE identified, and the ALJ relied on, the three sedentary, unskilled jobs identified by the VE as compatible with the physical RFC limitations set forth in the hypothetical inquiry. The ALJ specifically noted in his decision that these jobs would not require more than superficial interaction with the public. (TR 45). The ALJ did not identify any basis for this conclusion. Moreover, nowhere in the steps four and five discussion does the ALJ address the consistent opinions by mental health professionals that co-worker/supervisor interaction and job simplicity were additional functional limitations caused by Plaintiff's severe, multiple mental impairments. Most significantly, the ALJ did not include any mental restrictions in the hypothetical inquiry posed to the VE. An ALJ "may not ignore evidence that does not support his decision, especially when that evidence is significantly probative." Briggs ex rel. Briggs v. Massanari,

248 F.3d 1235, 1239 (10th Cir. 2001)(quotation omitted); see also Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996)("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss . . . significantly probative evidence he rejects."). "[P]sychological opinion may rest . . . on observed signs and symptoms," Robinson v. Barnhart, 366 F.3d 1078, 1083 910th Cir. 2004), and an ALJ may not substitute his or her own judgment for that of a medical professional. See Winfrey v. Chater, 92 F.3d 1017, 1022 (10th Cir. 1996). Because there is not substantial evidence to support either the ALJ's step four RFC finding or the ALJ's step five finding, the Commissioner's decision should be reversed and remanded for further administrative proceedings.[4]

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ March 14th ____, 2011, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421,

---

[4]As Plaintiff points out, the ALJ also failed to specifically address Dr. Poyner's opinion set forth in his report of a consultative psychological evaluation of Plaintiff that Plaintiff was unable to work (TR 311) or Mr. Britt's opinion that Plaintiff would need to take multiple breaks during the workday (TR 135). On remand, these medical assessments should be addressed within the applicable regulatory framework.

1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____22nd_____ day of ____February_____, 2011.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE